UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

```
- - - - - - - - - - - - - - - - x
                               :
MARY REIDT, ON BEHALF OF       :  No. 3:18CV1538(RNC)
 FRONTIER COMMUNICATIONS 401(K) :
 SAVINGS PLAN, AND ALL OTHERS   :
 SIMILARLY SITUATED,            :
                               :
                Plaintiff,     :
                               :
         vs                    :
                               :
FRONTIER COMMINICATIONS CORP,  :
 ET AL,                        :
                               :  HARTFORD, CONNECTICUT
                Defendants.    :  NOVEMBER , 2019
                               :
- - - - - - - - - - - - - - - - x
```

ORAL ARGUMENT

BEFORE:

HON. ROBERT N. CHATIGNY, U.S.D.J.

APPEARANCES:

FOR THE PLAINTIFF:

IZARD KINDALL & RAABE, LLP
29 South Main Street, Suite 305
West Hartford, Connecticut 06107
BY:  MARK P. KINDALL, ESQ.
DOUGLAS P. NEEDHAM, ESQ.

FOR THE DEFENDANTS:

MAYER BROWN LLP
1999 K Street N/W
Washington, DC 20006-1101
BY:  BRIAN D. NETTER, ESQ.

Darlene A. Warner, RDR-CRR
Official Court Reporter

1                           2:07 P.M.

2

3          THE COURT:  Good afternoon.  We're here for oral

4     argument on the motion to dismiss.  Would you please state

5     your appearances.

6          MR. KINDALL:  Good afternoon, Your Honor, Mark

7     Kindall, Izard Kindall & Raabe.  With me is my colleague

8     Douglas Needham.

9          THE COURT:  Good afternoon.

10         MR. NETTER:  Good afternoon, Your Honor, Brian

11    Netter, Mayer Brown, for the defendants.  I'm joined by --

12         MR. FAHEY:  Patrick Fahey of Shipman & Goodwin,

13    Your Honor.

14         MR. GREIFZU:  John Greifzu, Frontier

15    Communications.

16         THE COURT:  Good afternoon.

17         I've read your papers and the cases that you

18    cite and you're welcome to make whatever presentation you

19    wish.

20         Mr. Netter?

21         MR. NETTER:  Thank you, Your Honor.

22         As the Court is aware, we're here on a motion to

23    dismiss pertaining to an ERISA breach of fiduciary duty

24    action having to do with the Frontier Communications

25    401(k) plan.

1        Frontier is a company that has grown through

2   corporate acquisitions.  As relevant here, there were two

3   corporate acquisitions involving units of Verizon that

4   ended up being acquired by Frontier.

5        When those corporate transactions were

6   completed, the former Verizon employees who became

7   Frontier employees brought their formerly Verizon 401(k)

8   plan assets over to Frontier, and those assets were

9   ultimately folded into the Frontier 401(k) plan.

10       Those participants had legacy investments in

11  Verizon stock that were frozen into a Verizon stock fund

12  that they were entitled to retain but were also eligible

13  to divest at their election, because in a 401(k) plan,

14  participants get to decide how to invest their money.

15       The allegations in this complaint are that the

16  fiduciaries to the Frontier 401(k) plan should instead

17  have forcibly divested those assets as soon as Verizon was

18  acquired and the assets were transferred into the 401(k)

19  plan.

20       As the Court is aware from the papers, this is

21  not the only case in which plaintiffs have alleged that

22  legacy assets of a former employer needed to be divested

23  after a corporate transaction has been completed.  All of

24  the other cases that arise in the same factual

25  circumstance have been dismissed at the motion to dismiss

1    stage.  We believe that the reasoning of those cases is

2    correct and that this complaint should be dismissed as

3    well.

4                 THE COURT:  What is the fiduciary's obligation

5    in a situation like this?

6                 Can the fiduciary simply turn a blind eye to it

7    because it's a defined contribution plan and there's a

8    large menu of options notwithstanding what seems to be a

9    pretty good argument that objectively one would not want

10   to have all his or her eggs in this one basket?

11                MR. NETTER:  Well, Your Honor, the obligation of

12   the fiduciaries in a 401(k) plan is to ensure that there

13   are sufficient investment options to permit planned

14   participants to fashion a prudent retirement portfolio

15   that reflects their individual risk and return

16   preferences.

17                If it were the case that there were one single

18   optimal portfolio, then Congress would not have seen fit

19   to create this structure where the participants get to

20   choose how to invest their assets.  In order to prevail on

21   this motion, Frontier doesn't have to establish that it

22   would have been prudent for participants to put

23   100 percent of their eggs in the Verizon basket.  Instead

24   the question is whether, when considered in conjunction

25   with the other investment options, it was prudent to

1    permit participants to have access to Verizon stock.

2              THE COURT:  Does the fiduciary have an

3    obligation to monitor what the individuals are doing?  Or

4    is the fiduciary free to allow a situation to exist in

5    which individuals may put all of their eggs in this one

6    basket?

7              MR. NETTER:  So, Your Honor, I think you're

8    referring to -- or I guess the Court's question is the

9    extent to which the fiduciaries have some paternalistic

10   obligation to make sure the participants aren't themselves

11   making poor investment decisions.

12             THE COURT:  That's one way of putting it.

13             MR. NETTER:  And the way that ERISA cures that

14   problem is through disclosure.

15             So there are a variety, quite lengthy required

16   quarterly, annual and new participant disclosures that

17   come out explaining the nature of the investments,

18   explaining the risks that are associated with those

19   investments, that are then supposed to enabling the

20   participants to make appropriate options.

21             Congress put into ERISA Section 404(c) of the

22   statute, which said if you're making the right disclosures

23   and the participants do something that is totally a bad

24   idea, that's not the fiduciaries' fault.

25             THE COURT:  Okay.

1          MR. NETTER:  So disclosure is the solution to

2    participants making suboptimal decisions.

3          But at the end of the day, the obligation of the

4    fiduciaries is to make options available such that

5    participants can craft a prudent portfolio.

6          THE COURT:  This is a bit off the track, I

7    suppose, but just briefly:  What disclosure, if any, took

8    place with regard to this alleged problem with the Verizon

9    Legacy Single Stock fund?

10          MR. NETTER:  So, Your Honor, the record that's

11    before the Court on this motion to dismiss is necessarily

12    limited.  We cited in our papers to the annual report of

13    the plan, which is known as Form 5500, which discloses

14    that this is a non-diversified fund.  And I think we quote

15    the language of the Form 5500 in our papers.

16          The participants also have access to quarterly

17    statements that explain the returns associated with each

18    fund.  There's a summary plan description that explains

19    the terms on the investment options that are available to

20    plan participants.  They also get annual performance data

21    that shows each of the investment options, the performance

22    of the investment options and the fees associated with

23    them, the comparison of the performance of those funds to

24    the performance of benchmarks funds.

25          So there are quite a few disclosures that are

1    provided to participants that allow them to make

2    appropriate decisions that suit their own personal

3    interests.

4         Now, with respect to the particular statutory

5    obligations that the plaintiffs have invoked -- the

6    plaintiff, excuse me -- has invoked in her complaint,

7    those fall under the rubric of the duty to diversify and

8    the duty of prudence.  And the Second Circuit has already

9    chimed in as to how the duty to diversify should be

10   understood in the context of a 401(k) plan.

11        The Young v. General Motors Investment

12   Management Company, which I understand calls itself the

13   GMIMCO case establishes that the only obligation under the

14   duty to diversify is plan level diversification.  That

15   there is no claim under ERISA for failure to diversify an

16   individual fund option within a 401(k) plan.

17        THE COURT:  Suppose you had a menu containing

18   all kinds of options but in fact everybody's invested in

19   one stock, what does ERISA have to say about that?

20        MR. NETTER:  I think, Your Honor, that at the

21   end of the day, Section 404(c) of ERISA would resolve that

22   question.  And so long as the fiduciaries were doing what

23   they could to provide options to participants, if the

24   participants nevertheless decided they were most

25   comfortable with concentrating their assets in a

1    particular location, that the fiduciaries would have

2    satisfied their obligations.

3            Again this is the distinction between a pension

4    plan where the fiduciaries are actually making the asset

5    allocation decisions and a 401(k) plan where the

6    fiduciaries create the menu but the participants are

7    making the decisions.

8            No doubt, if fiduciaries were individually

9    making decisions for each participant, they would look

10   different, because people have peculiar risk preferences.

11   But the structure of a 401(k) plan is such that the role

12   of the fiduciary is limited to creating the menu.

13           THE COURT:  So in the hypothetical that I've

14   outlined, if I'm a fiduciary and I see this happening and

15   I worry that this single stock is a risky stock, so long

16   as I'm satisfied that these participants have a long menu

17   from which to choose, I'm fine, and if in fact that stock

18   craters and the fund loses close to 100 percent of its

19   value, that's not my problem.

20           MR. NETTER:  That's right, Your Honor, and I

21   think that's the take away from the Dudenhoeffer case,

22   that prior to Fifth Third Bancorp v. Dudenhoeffer, there

23   was a whole line of ERISA cases that involved employer

24   stock which is still subject to ERISA's duty in prudence

25   in which the plaintiffs would say it was really risky to

1    have such a great portion of the 401(k) plan in employer

2    stock and you fiduciaries should have seen what was

3    coming, you should have known that our own company stock

4    was going to falter, and you should have warned us and

5    discontinued investments in that fund.

6            And the Supreme Court in Justice Breyer's

7    opinion in the Dudenhoeffer case says we have to let

8    fiduciaries rely on the efficient market hypothesis, which

9    says that inefficient markets, the price of the stock is

10   going to reflect all of the available information, so the

11   price has to be assumed to be fair.

12           Now, the Dudenhoeffer opinion also references

13   the price and the risk level of the stock.  Because of

14   course, if you're getting into the academic mindset of how

15   stock prices are computed, it's discounting all of the

16   future profits of the company based on the prospects that

17   those profits will be achieved.

18           THE COURT:  Of course the plaintiff here says

19   that that's fine as far as it goes with regard to the

20   value of a single share of stock, but what does it tell us

21   about the concentration?

22           MR. NETTER:  Well, right, Your Honor.  And as to

23   this theory that risk is somehow different when you're

24   talking about a single stock, again we would return to the

25   point that the obligation of the fiduciary is to create a

1  menu.  The obligation is not to ensure that each

2  individual stock if invested 100 percent would be an

3  appropriate retirement asset.  So so long as you're at the

4  place where there are alternatives for diversification

5  that are available within the plan, the fiduciaries have

6  discharged their duties.

7          Were that not so, then all of the cases that

8  involve single stocks would come out the opposite way.

9  But in fact, even the case on which plaintiffs rely most

10  heavily, the Tatum case out of the Fourth Circuit, the

11  Fourth Circuit held there that it is not necessarily

12  imprudent to retain single stock investments.

13          And the one district court within the Fourth

14  Circuit that's considered one of these former employer

15  stock cases, that's the Quatrone case, having to do with

16  Gannett in the Eastern District of Virginia, considered

17  the plaintiff's arguments, treating Tatum as binding

18  authority and still dismissed that complaint.

19          So we don't view this concentration risk theory

20  as accomplishing anything additional other than trying to

21  create a per se rule that single stocks are imprudent that

22  would effectively create statute of limitations arguments

23  for the plaintiffs.  Because we're at the place that it is

24  categorically imprudent to have a single stock option

25  because of that concentration risk.  Then the plaintiffs

1    were on the clock six years after the plan acquired

2    Verizon stock, which was at the end of 2011, and they did

3    not file their lawsuit within six years of that date.

4            Now, in addition to the duty to diversify, which

5    we believe is governed by Young as applied by the other

6    district courts that have considered the former employer

7    stock and the duty of prudence which is dictated by

8    Dudenhoeffer as well as the Second Circuit's

9    interpretation of Dudenhoeffer and Rinehart, which

10   extended it to the risk context.

11           There are a number of other reasons why at least

12   portions of the complaint need to be dismissed, which the

13   Court need not reach if it agrees with our arguments as to

14   the duty to diversify and the duty of prudence.

15           In particular, the plaintiff has named Frontier,

16   the parent company, as a defendant, but all I can allege

17   with respect to the fiduciary function of Frontier is that

18   Frontier was responsible for appointing and monitoring

19   fiduciaries.  But there are no factual allegations as any

20   breach of that fiduciary duty.  It's not a fiduciary for

21   all purposes that is essentially responsible for all of

22   the fiduciary acts.

23           And we've also raised the limitation arguments,

24   which I've alluded to, and the standing argument that this

25   particular plaintiff lacks the authority to stand in for

1    participants who theoretically had an injury that predates

2    her participation in the plan.

3            But unless the Court has any other specific

4    questions, I'll let the plaintiff speak for themselves.

5            THE COURT:  Okay, just perhaps a couple.

6            I want to be sure I understand your position

7    with regard to what I take to be the plaintiff's claim

8    that the 401(k) plan as a whole was overly concentrated in

9    Verizon stock as well as in telecommunication stocks.

10           So assuming that it was okay to have a single

11   stock plan, assuming that's not per se a violation of

12   ERISA, still the amount of Verizon stock was imprudent and

13   the amount of telecommunication stock was imprudent viewed

14   in light of the total holdings.

15           MR. NETTER:  So, Your Honor, we cite in our

16   reply brief a reference to the legislative history of the

17   duty to diversify when ERISA was first enacted.  And in

18   the legislative history -- I believe it's the report, the

19   committee report that led to the enactment of ERISA --

20   it's explained that in the pension context, historically

21   it had been fine, it had been considered appropriate to

22   have as much as 50 percent of a pension plan invested in a

23   single asset.  And the thinking of the drafters of ERISA

24   was it would surely not be problematic to have at least

25   25 percent or up to 25 percent invested in a single

1   industry.  And that again is in the pension context where

2   the fiduciaries had complete control over where to put the

3   money.

4           So if it was okay in the pension context as the

5   statute was being crafted to have a quarter of the fund in

6   a single industry, then it surely was okay for

7   participants to voluntarily elect to dedicate 15 percent

8   of the 401(k) plan into telecommunication stocks.

9           THE COURT:  Thank you.

10          Last question.  Again speaking hypothetically:

11  Suppose a fiduciary had an obligation to in effect veto or

12  override the decision of the participant to keep his or

13  her money in Verizon stock, what is the mechanism by which

14  one would forcibly divest people of their stock?  How

15  would that work?

16          MR. NETTER:  Well, Your Honor, the fiduciary

17  does have the authority to change the investment options

18  that are available.  So it would be theoretically possible

19  for the plan to announce that there's a new investment

20  lineup and that the old investments are being mapped to

21  new funds such that participants could decide where they

22  wanted to put their money of new.  So that's theoretically

23  possible.

24          It's theoretically possible for the lineup to be

25  changed.  I'm not aware of any theoretical possibility of

1    a fiduciary stepping in to say that individuals had too

2    much and doing kind of a partial mapping like that.

3            And I should say to this point also that there

4    seems also to be a standing issue with the plaintiff

5    saying that in the aggregate all of the participants had

6    too great of a percentage invested in Frontier stock.

7    Because what's the injury to an individual's interests

8    that stems from the collective investments of a group?

9            Now, Ms. Reidt is not alleging that she herself

10   had too great of a concentration in Frontier stock.  She's

11   looking at statistics having to do with everybody across

12   the plan.  And when that's aggregated again with former

13   AT&T employees, as we note in the papers, that's just a

14   separate cohort of Frontier employees who were former AT&T

15   employees.  So we don't think that it even would have been

16   possible for individuals to have both AT&T and Verizon

17   stock in the Frontier plan because they would have had to

18   come over to Frontier from one former company or the

19   other.

20           THE COURT:  Thank you.

21           MR. NETTER:  Thank you, Your Honor.

22           MR. KINDALL:  Good afternoon, Your Honor.

23           THE COURT:  Good afternoon.

24           MR. KINDALL:  Let me take that last point first,

25   if I could.  The issue was whether or not you can forcibly

1   divest plan participants.  It's not really simply a

2   theoretical possibility.  In fact, that's essentially what

3   Tibble was talking about in saying, look, a fiduciary has

4   a continuing duty to monitor a plan, divest from

5   investments that have become imprudent, and the mechanisms

6   for doing that we contemplated when we were drafting the

7   complaint.

8           And in the case of the Verizon stock at issue

9   here, our thought process, based on our discussions with

10  experts in the field, was:  Well, when you have this shot

11  of stock that has been put into the plan, which happened

12  in this case in December 30th of 2011, the fiduciaries of

13  the plan have this new asset and at that point they had a

14  duty to evaluate it and to determine whether or not under

15  Tibble it continued to be a good investment for the plan.

16          What Tatum teaches is that you have to -- if

17  you're going to do your job as fiduciary, you're going to

18  have to make an evaluation and that's going to take some

19  period of time, and we calculated that that period of time

20  would be on the order of six months; that it could be done

21  in that period of time, and that following that, you would

22  want to give plan participants an opportunity to make

23  their own decision as to where they wanted to move the

24  money.

25          You would give an announcement.  You would say

1    on date certain we are going to close this fund and anyone

2    who has not moved their investments out of the fund as of

3    that date, we will move the funds to a default investment

4    option.  And in fact, this plan did do that with respect

5    to both the Verizon and the AT&T stock funds.  It did it

6    on April 30, 2018 as reported in their 2018 Form 5500.

7             So effectively what they did was they told

8    people, we're closing these funds on April 30, 2012 and

9    you have a period of time to choose your own place where

10   you want these investments to land.  If you don't make an

11   election, we will invest them in our -- on our Freedom

12   Funds, which were a series of target date funds that they

13   had in the plan.  It was the default investment option for

14   the plan.

15            So there's a mechanism for doing it.  It's done

16   all the time.  It was in fact done with respect to these

17   stock funds.  But it was done seven years -- seven and a

18   half years -- after they had been sitting in the plan and

19   they had been performing vastly below what the market had

20   been performing over the course of that seven and a half

21   years.

22            Now, that's hindsight.  That only relates to the

23   issue of whether or not the plan suffered any kind of

24   injury, or the plaintiff did for that matter, as a result

25   of the defendant's inaction.  That's not how you look at

1    whether or not it should have been divested sooner.

2            But that question whether or not it should have

3    been divested sooner is something that requires a factual

4    development of a record, because the question here is,

5    okay, we've got this asset in the plan and we are

6    fiduciaries of the plan.  Is this an appropriate asset for

7    a retirement plan to be holding.

8            Now, when this stock was in the Verizon plan, it

9    was a per se appropriate stock for that plan, and the

10   reason for that is that Congress in its wisdom decided

11   that they wanted to incentivize companies to offer stock

12   ownership plans to employees.  They thought it was a good

13   idea.  A lot of market professionals disagree with that,

14   but Congress gets to write the rules, and so they said

15   we're going to incentivize companies to offer employee

16   stock ownership plans so the people will feel a sense of

17   ownership in the company that they're in, and we're going

18   to incentivize them in a couple of different ways.

19           One of the ways that they decided to do that was

20   to carve out some very specific exceptions to rules in

21   ERISA that would otherwise have made these stocks very

22   problematic investment options in plans.

23           The first one is that Section 404(a)(1)(C),

24   specifically talks about making sure that the fiduciaries

25   having a duty to make sure that a plan is properly

1    diversified; and the second is 404(a)(1)(B), which is the

2    general fiduciary duty to only invest in prudent

3    investment options in the plan.  And the ERISA statutory

4    text expressly recognizes that that 404(a)(1)(B)

5    obligation carries with it a duty to make sure that your

6    investments are diversified.

7            THE COURT:  In this case, what's the difference

8    between your diversification claim and your prudence

9    claim?

10           MR. KINDALL:  So technically under Young v.

11    General Motors, as the defendants have argued, the

12    diversification claim, the 404(a)(1)(C) claim, has to be

13    directed to whether the plan as a whole is diversified.

14           And so there we're talking about whether it was

15    appropriate for the plan as a whole, starting from the

16    very day that this stock was dropped into the plan, to be

17    sitting there holding over 15 percent at that time of

18    shares in one single company, not an employer stock, so

19    not carved out from the diversification duty.

20           THE COURT:  Can I ask you to pause right there,

21    please?

22           MR. KINDALL:  Sure.

23           THE COURT:  Do you have any authority for the

24    proposition that 15 percent is over concentration?

25           MR. KINDALL:  It's not a per se rule.

1            Now, the defendants have come back and they've

2     said, well, but ERISA's legislative history if you look at

3     it says 25 percent in one industry.  And where that's

4     significant, we had this allegation in our complaint, is

5     that you can go out on the market and you can get a mutual

6     fund that is directly -- that's a concentrated fund.  It's

7     not considered a diversified fund.  It is a concentrated

8     fund in the telecommunications industry.  So you could get

9     such a fund.

10            And, you know, according to that legislative

11     history, it would be appropriate in certain circumstances

12     for you to have that telecommunications mutual fund as an

13     investment option in the plan, and it would not clearly

14     have troubled the drafters of ERISA that the fund ended up

15     with 25 percent of the -- or less -- of the total holdings

16     of the plan.  But that fund has only two and a half

17     percent of its assets invested in Verizon stock.

18            So what we're alleging here -- and it really is

19     a matter of context and expert testimony -- is that for

20     this plan in particular to be holding a large amount of

21     one company's stock, and that being Verizon, was not

22     prudent given the structure of the plan as a whole.

23            To start with, this is a plan for Frontier

24     employees.  They have their own company stock fund which,

25     like any company stock fund, is protected under ERISA from

1    the duties of diversification and the duty of prudence

2    insofar as it requires diversification.  They have their

3    own company stock fund.  It's Frontier stock.  And so it

4    is already going to be positively correlated with the

5    Verizon stock that's coming over.  They're in the same

6    industry.

7             And then two years later they drop in yet more

8    company stock, another single company stock fund also in

9    the telecommunications industry.  And then a year after

10   that, they put in still more Verizon stock into the

11   Verizon stock fund.

12            So effectively what they're doing is they are

13   not being careful about the structure of their plan as a

14   whole to ensure that it is properly diversified to

15   preclude large losses.

16            THE COURT:  Please understand that I have not

17   had an ERISA case go to trial in which expert testimony

18   was presented on whether a particular course of action was

19   prudent or imprudent.  Does it just become a battle of the

20   experts?

21            MR. KINDALL:  To some extent, sure, it is a

22   battle of the experts.  And you certainly see that play

23   out in Tatum.

24            THE COURT:  Who gets to decide?

25            MR. KINDALL:  That would be for the Court to

1    decide.  This is a pure -- it's a Court issue.  It's not a

2    jury issue.

3         THE COURT:  Okay.  I asked you to pause to

4    pursue that aspect of the case, that 15 percent in itself

5    is problematic.  You were on your way to a different

6    point, I believe.

7         MR. KINDALL:  Well, I think that that's the

8    point that I wanted to make about the 404(a)(1)(C) claim,

9    which is that we don't believe we've run afoul of Young v.

10   General Motors because with respect to that claim, we are

11   saying that the plan as a whole was not properly

12   diversified and that this was something that the

13   fiduciaries would have known from the very beginning.

14   From the time that the stock was first put into the plan,

15   they would have seen that this was a very large slug of

16   stock, that it was in the same industry as the company

17   stock funds that they were already setting up for their

18   employees and that this was not a situation that was

19   conducive to protecting the plan from large losses that

20   result from concentration risk.

21        So, yes, that's a 404(a)(1)(C) claim.

22        THE COURT:  The gist of what the defense is

23   saying here, and indeed what some district courts seem to

24   have said, is that as between putting the burden on the

25   fiduciary to in a paternalistic way decide what the

1    participants' investments are going to be by forcibly

2    divesting participants of their interests in the single

3    stock fund on the one hand and on the other leaving it up

4    to them to get out of that stock if they wish, ERISA

5    prefers the latter.

6            MR. KINDALL:  Well, let me address that in a

7    couple of different ways:

8            The first is that the defendants' first line of

9    defense, if you will, and this is to say we deal with that

10   through disclosure, and that's what the specific defense

11   in 404(c) in the statute is all about.  Well, that's fine

12   except that 404(c) is an affirmative defense.  It's not

13   been put at issue in the complaint whatsoever and we have

14   no proof on 404(c) at this stage in the game.  We don't

15   even have allegations about 404(c) at this stage of the

16   game.

17           There's a Fifth Circuit decision from 2015 we

18   cited in our brief where the Court makes a point of saying

19   there are 25 different requirements to make a 404(c)

20   defense.  This isn't something you deal with on a motion

21   to dismiss.

22           If the defendants' argument were correct, you

23   would effectively relieve the defendants, not only of the

24   ability to prove their 404(c) defense, but of even having

25   to plead it because you would say "per se" if the

1    participant is given choice, we're done, you've got

2    nothing else to talk about.

3           Now, the defendant came back to this on a number

4    of occasions, the argument that somehow the plaintiffs

5    here are arguing for a per se rule.  That it's per se and

6    unreasonable to have a single stock fund in a 401(k) plan.

7    We are not the ones arguing for a per se rule here, not

8    remotely.

9           We understand that we have made allegations in

10   the complaint; that we have to prove them at trial; that

11   the burden of proof is on us; and if we fail in that

12   burden of proof, we lose.

13          The defendants are arguing for the per se rule.

14          THE COURT:  Well, as I read the complaint, one

15   of your claims is that it was improper to have the single

16   stock fund, period.

17          MR. KINDALL:  What I would say, Your Honor, is

18   it ought to at least raise a red flag.  And the reason why

19   it ought to raise a red flag is that there is no question

20   that a single issue stock fund has concentration risk that

21   other funds don't have.  And so in order to make this a

22   legitimate investment for a retirement plan under ERISA,

23   an investment option that a reasonably prudent fiduciary

24   would consider as being a good idea, you would need to be

25   able to say there is some reason for the fiduciary to

1  believe that the investment performance of that stock is

2  going to be superior to the market so that you can -- so

3  that the plan participants have a reasonable hope of being

4  compensated for the concentration risk that they

5  necessarily have to take on if they're in this stock.

6          THE COURT:  I understand that to be the gravamen

7  of the claim.  Has any court blessed that theory?

8          MR. KINDALL:  Not in the context of these cases.

9  But effectively Tatum involved the exact question.

10         Because what happened there was the inverse of

11  here obviously.  You had a company that had one of these

12  spinoffs and the question was, well, okay, you've got all

13  this RJR stock, what do we do with that?  And the plan

14  fiduciaries operating under, it turned out, an erroneous

15  assumption about their plan divested immediately.  They

16  divested within six months from the stock.

17         And it turned out that out of the blue, Carl

18  Icahn stepped in, made a big offer, all of a sudden the

19  stock went up, and the people who had been forcibly

20  divested from the stock sued.  And they said, wait, this

21  wasn't prudent.

22         Well, it turned out that they hadn't employed a

23  prudent process.  They hadn't done what I was discussing

24  in the beginning.  They didn't investigate, they didn't

25  look at whether or not this was a proper option for the

1    plan or any of those other things they thought they had to

2    do.  But the Court said, well, okay, that's fine, but if a

3    prudent fiduciary could have done this anyway, then no

4    harm no foul.

5         It went up to the Court of Appeals.  The Court

6    of Appeals said, no, that's not good enough.  You, court,

7    have to decide that a prudent fiduciary would have

8    divested, would have done that under those circumstances.

9         And so the district court went back and looked

10   at the record, it weighed all of the evidence, it weighed

11   all of the testimony, it weighed the different experts,

12   and it said, well, actually a prudent fiduciary would have

13   divested the stock.

14        Put hindsight aside because we can't look at

15   that -- there was no way to know that Carl Icahn would

16   step in.  And effectively when you read the judge's

17   decision, the primary driver was because the single issue

18   stock fund had concentration risk that was not part of a

19   price of the stock, it wasn't unlike in Dudenhoeffer

20   priced into the stock, and as a result there wasn't any

21   reason to believe that this stock was going to outperform

22   the market.

23        So people were taking on this extra risk with no

24   realistic expectation of beating the market.  And so you

25   were effectively being imprudent because you were putting

1   an investment option in the plan where participants who

2   chose it would be bearing extra risk without being

3   compensated.

4            And that was the basis for the decision.  That's

5   why it ended up getting thrown out.

6            THE COURT:  Did the Court reckon with the

7   argument, well, that's up to the participant?

8            MR. KINDALL:  Well, it didn't because in this

9   circumstance it was the inverse.  It wasn't left to the

10  participants.

11           THE COURT:  I see.

12           MR. KINDALL:  So that really wasn't a factor in

13  this case.

14           THE COURT:  How would this theory of

15  uncompensated risk work in light of the way ERISA treats

16  employer plans?

17           In other words, here we have a case in which as

18  a result of these spinoffs, what have been okay for the

19  employer to do, suddenly becomes a problem.  Why?

20  Because, as you say, well, the fiduciary is tolerating an

21  uncompensated risk which really is not appropriate.  You

22  don't have all your eggs in one basket.

23           Doesn't that tend to undermine the special

24  status that the employer fund had before this spinoff?

25  How do you reconcile it?

1            In other words, if it's imprudent in effect per

2    se for a fiduciary to have this type of single issue

3    investment option, what does that say about the single

4    issue investment option that one sees with the employer

5    stock fund?

6            MR. KINDALL:  Well, the short answer is that

7    Congress answered that question.  Congress said you can't

8    look at that.  You can't look at -- you cannot determine

9    that an employer stock fund is imprudent because of

10   failure to diverse.  They made a carve-out.

11           THE COURT:  I guess, if I were to embrace your

12   theory, would I be in effect saying that Congress, for

13   reasons unrelated to the considerations that we expect

14   fiduciaries to investigate in a way, allows employers to

15   sponsor what really are imprudent investment funds for

16   their employees?

17           MR. KINDALL:  I think that it would be more

18   fair, Your Honor, to say that prudence is context specific

19   and the context that, you know, the prudence standard in

20   ERISA specifies the language as an enterprise of a like

21   character and with like aims, right?  And in Dudenhoeffer

22   the Supreme Court said as a general rule what you're

23   talking about is, okay, for an ERISA plan, it's an

24   enterprise with the exclusive purpose of providing

25   benefits to employees.  And that's generally what an ERISA

1    plan is and what it's about.

2            And so for an ERISA plan to invest in a single

3    issue stock fund, it's not prudent for a plan if your

4    goal, if your sole focus, is to provide a good retirement

5    plan for your employees.  That's not connected to that

6    goal.  That is not a prudent option because it doesn't

7    match the goal.

8            However, a like enterprise when you're dealing

9    with an employer stock fund, has another purpose.  And it

10   is a purpose apart from simply providing a retirement plan

11   for its employees.  It is the purpose of providing an

12   ownership stake in the company to people who are working

13   there, which Congress felt was a reasonable objective.  In

14   fact, felt was a sufficiently important objective that

15   they were willing to make a carve-out in what would

16   otherwise be a fairly high hurdle that these plans would

17   have to deal with.  And in fact Dudenhoeffer specifically

18   mentions this.

19           In the Dudenhoeffer case, the Supreme Court

20   case, the Supreme Court mentions this carve-out and says

21   it's important because on its face a single stock is not

22   prudently diversified, that's why you have to have it.

23           Now, the defendants have argued in response to

24   this, well, but when they did this carve-out in ERISA,

25   they were thinking about ESOP's, they were thinking of a

1  plan that was nothing more than an employee stock fund, so

2  it would be an entire plan that had only one investment

3  option.

4          The problem with that theory is that that's not

5  what Congress actually did.  The exemption doesn't apply

6  just to ESOP's.  It applies in the case of an eligible

7  individual account plan.

8          Now, an ESOP is an eligible individual account

9  plan, but so is a 401(k).  If the Congress had wanted to

10  limit the carve-out just to ESOP's it could have done

11  that, and they didn't.

12          So the reason, I think you have to assume, is

13  that Congress believed that it was sufficiently important

14  to allow employees to invest in their own company that

15  they were willing to make a carve-out in 401(k)'s, in

16  ESOP's and all those different kinds of plans for employer

17  stock, and they did that specifically, and as a result

18  employers flocked these.  You had lots of them.

19          And, in fact, most of the cases that have

20  addressed this issue, Dudenhoeffer, Saumer, Rinehart,

21  there are a host of them that are in all of the briefs and

22  certainly in the defendants' brief.  Most of those cases

23  involve employer stock.  And, in fact, all of the cases

24  that have talked about how Dudenhoeffer should be applied

25  to risk with the exception of the four district court

1    decisions that have addressed this issue more directly,

2    but apart from those four district court decisions, all of

3    those other issues that have talked about it said that,

4    well, when Dudenhoeffer said that, you know, employers

5    should be able to rely on the -- or a plan should be able

6    to rely on the market price of the stock, they meant risk

7    as well as value.  All of those were -- all of the

8    appellate court decisions in that field were all dealing

9    with it in the context of an employer stock fund.

10            And that's important because even Dudenhoeffer

11   said that, generally speaking, you have to apply the same

12   duty of prudence regardless of whether you're dealing with

13   an employer stock or a non-employer stock.

14            It specifically carved out the fact that except

15   with respect to diversification because Congress made that

16   carve-out.  And that's true also for Rinehart and for

17   Saumer and for the rest.

18            That's significant here obviously because the

19   risk that we are talking about is concentration risk, is

20   the risk that a single issue stock fund is not prudently

21   diversified.

22            THE COURT:  Let me ask for your insight with

23   regard to the district court decisions that involve this

24   situation and go the other way.

25            Ordinarily, as you might imagine, when a

1    district judge is disagreeing with another district judge,

2    the challenge is to explain in a way that is respectful of

3    what the other judge didn't see or what the other judge

4    somehow misunderstood.

5          Tell me how would you write the opinion in this

6    case coming out the opposite way from all those other

7    judges.  What did they not see?  What did they not

8    understand?

9          MR. KINDALL:  With respect to the issue we were

10   just discussing, the Dudenhoeffer issue, which I think is

11   central to the opinions in those four decisions, I think

12   that what they saw was they saw the original opinion from

13   the supreme court, they saw a number of appellate court

14   decisions, really pretty uniform, a set of appellate court

15   decisions saying this applies also to risk.

16         What they didn't do was take the next step and

17   say, yes, but that was the type of risk by its terms that

18   would be reflected in a stock's price, because that was

19   the whole intellectual underpinning for Dudenhoeffer's

20   carve-out in the first place.  And that if you had a type

21   of risk which -- I mean, really, I really don't think the

22   defendants even could argue the concentration risk is

23   incorporated in the stock price -- if you had a type of

24   risk that didn't fit that paradigm, then Dudenhoeffer

25   really can't apply, and the cases that talk about how

1    you've got this effectively what has become a per se

2    standard in ERISA-land that, you know, so long as you're

3    buying a publicly traded stock in an efficient market, you

4    know, the stock price is what the stock price is and it

5    incorporates all of this risk, that that per se rule

6    really can't apply to a type of risk that by its very

7    terms cannot be incorporated in the stock price.

8            THE COURT:  I think that you have a point in

9    that regard; but if we go beyond that, you still bump up

10   against the district court's analysis of the

11   diversification claim.

12           They say that, as the defense argues here, you

13   look at the plan as a whole in determining whether there

14   has been a breach of fiduciary duty in that regard rather

15   than looking at a single option within the plan.  Then

16   going beyond that, they seem to say that, again, as

17   between having a fiduciary veto, the decision-making of

18   the plan participant, they leave it to the plan

19   participant to get out of the stock if that's what the

20   plan participant wants to do.

21           MR. KINDALL:  Sure.  I would address that a

22   couple different ways.

23           One we've already talked about, which is that's

24   a 404(c) defense.  And if you want to make a 404(c)

25   defense, have at it.  It's not an issue for a motion to

1    dismiss.

2            But truthfully the more serious answer to that

3    from my perspective is that courts have recognized,

4    including courts in the Second Circuit, courts have

5    recognized that the ability of plan participants to choose

6    different investment options is not implicated by the duty

7    of the plan fiduciaries in the first instance to select

8    appropriate investment vehicles.

9            In other words, that the fiduciary is

10   responsible for selecting good and proper investment

11   vehicles for a plan and 404(c) has nothing to say about

12   that.  If you didn't choose the right investment options

13   to begin with or if you kept investment options when they

14   ceased to be prudent, you're on the hook for that even

15   though plan participants looking at the same data that you

16   were could have gotten out.  That's black letter law.

17           And really that's what Tibble is about.  Tibble

18   says, well, no, fiduciaries have a duty to monitor and to

19   divest an investment option that's no longer prudent.

20   That's true even though plan participants have the ability

21   to get out of that option.

22           So the question here is, okay, does provided --

23   does simply providing a range of investment options

24   satisfy completely the duty to diversify?  And I think in

25   this circumstance we can say no for a couple of reasons.

1           One is that from the very beginning, from the

2    very moment that this investment vehicle was put into the

3    plan, the fiduciaries knew that it was a staggeringly

4    large percentage for a single issue stock fund.  So that

5    should have raised red flags even if nothing else did.  Is

6    that the plan had suddenly become very unbalanced.  And it

7    wasn't because of participant choice, it was because you

8    had this large investment that was imported over from a

9    different plan that had different objectives.

10           And, in fact, there is information that's been

11    put into the record by the defendants to indicate that the

12    Verizon stock that was imported over was at least in part,

13    and possibly in very large part, the result of Verizon

14    doing matching funds in the form of stock into its own

15    plan.

16           So participants may have just never bothered to

17    move the stock, but that's not really the central issue.

18           The central issue is, okay, you've got this new

19    investment that gets dropped into the plan.  The

20    fiduciaries didn't have anything to do with that.  That's

21    a plan sponsor thing.  But the fiduciaries then have a

22    responsibility to do something with it.  And the something

23    that they had a responsibility to do was to evaluate

24    whether it was a proper fund for the plan, and they had

25    that duty regardless of the fact that the plan

1    participants could have moved to other options.  That is

2    at the heart of their duty as fiduciaries for this plan.

3              And if you think about it, imagine you were

4    dealing with a circumstance where there was a structural

5    issue with a particular investment fund that as a matter

6    of logic and fact could not be reflected on a stock's

7    price and that fact made that investment four times more

8    risky than any other investment, you would expect that the

9    fiduciaries in fulfilling their job would have to evaluate

10   that and would have to say, well, do we have any reason to

11   believe that this investment is going to outperform an

12   investment option that does not have this sort of

13   structural issue in it, that does not have this structural

14   risk that's not incorporated into the price.  Because

15   since the risk isn't incorporated into the price, it means

16   the price hasn't been lowered.  So you're paying full

17   freight, effectively, for this investment, but it's much

18   riskier.

19             You would think that in those circumstances,

20   unless the investigation yielded the result that, yeah,

21   we've got a good reason to believe that this investment

22   vehicle is going to outperform the market, and here's our

23   evidence for that, that you would say, no this doesn't

24   belong in the plan, we need to wind this down.

25             And the fact that the participants could have

1    done it on their own, that's not good enough.  This is why

2    we have fiduciaries.

3            THE COURT:  In that regard, it's my impression

4    from looking at the briefs and the cases cited in the

5    briefs that what happened here with Verizon and Frontier

6    has happened over and over again.  You have these spinoffs

7    whereby employees move from Verizon to Frontier and that

8    Verizon stock comes with them, and based on this sample,

9    it appears that in each instance, the fiduciaries were

10   okay with that.

11           MR. KINDALL:  Except in the case of Tatum where

12   they were not.

13           It's effectively the same circumstance.  And, in

14   fact, in the district court's' decision in Tatum, it talks

15   about some of the expert testimony that they had, and the

16   expert testimony indicated that there were almost no

17   instances of 401(k) plans holding single issue

18   non-employer stock.

19           THE COURT:  So this is actually an aberration?

20   Are you suggesting that what I'm seeing here is not the

21   industry standard, it's actually an aberration, that most

22   fiduciaries would not sit still for this?

23           MR. KINDALL:  I think what I am suggesting is

24   that that is correct.  And that there certainly have been

25   instances, and we've got five different case where we've

1    seen it, you know, the four district court decisions in

2    Tatum -- well, six I guess counting this case.

3         But I don't think this is necessarily industry

4    standard or anything like it, but it will become industry

5    standard if the rule that the other courts have put into

6    place sticks.  And the reason for that is Tatum.

7         In the Tatum case, you had a fiduciary make what

8    was on the facts the right call.  They said, you know

9    what, this isn't the right investment vehicle for the

10   plan.  And, you know, based on a wrath of testimony, the

11   district court said, you're right, a prudent fiduciary

12   would not allow this, but that required a full trial.

13        It went up to the Court of Appeals twice.  There

14   are seven different Tatum decisions.  That's why we number

15   them in Tatum -- seven.

16        It was a lot of work, it was a lot of effort, it

17   was a lot of cost and expense, whereas --

18        THE COURT:  A lot of judicial resources.

19        MR. KINDALL:  Yes.

20        Whereas if the defendants prevail here -- this

21   is the last case standing, Your Honor -- if the defendants

22   prevail here, then any fiduciary put in this position in

23   the future will say, I'm not divesting.  I've got a per se

24   rule that says I don't have to divest and if I do divest,

25   I've got to face a lawsuit.  Not doing it.

1          THE COURT:  Thank you.

2          MR. KINDALL:  Thank you, Your Honor.

3          THE COURT:  I'll give you the last word, but I

4    need to caution you, please be brief.

5          MR. NETTER:  I'll be as brief as I can, Your

6    Honor.

7          THE COURT:  Sure.

8          MR. NETTER:  There are four quick points that I

9    had noted during my adversary's presentation.  The first

10   is with respect to Section 404(c).

11         Now, this is the section of the statute that the

12   plaintiffs say is an affirmative defense, and it is an

13   affirmative defense when it arises.  That's the section of

14   the statute that says if a participant comes in and says I

15   regret having made this particular decision, they can't

16   blame it on the fiduciaries.

17         But this is not a case where Ms. Reidt is coming

18   in and saying, I personally had too much money in employer

19   stock.  She's saying the fund shouldn't have been in the

20   lineup in the first place.  And courts have held that

21   404(c) does not create a situation where a fiduciary

22   doesn't still have to decide which funds to offer.

23         But we quote on page 8 of our opening memorandum

24   the conference report about Section 404(c) which I think

25   is quite instructive here.

1             It says, if the participant instructs the

2    planned trustee to invest the full balance of his account

3    in EG, a single stock, the trustee is not to be liable for

4    any loss because of the failure to diversify or because

5    the investment does not meet the prudent man standards.

6             And that seems to us to be fairly conclusive in

7    establishing that Congress thought that single stock funds

8    could be permissible, that the notion that they could be

9    in a plan, that they could be acceptable, is reflected in

10   the conference report from 1974.

11            Plaintiff's counsel also indicated that he

12   thought that Congress was specifically saying that there

13   was a diversification rule that was different or that was

14   intentionally encompassing both ESOP's and 401(k) plans, I

15   just want to point out that there's a timing problem

16   there, which is that ESOP's existed when ERISA passed,

17   401(k) plans didn't.

18            So I don't think we can infer that Congress had

19   in mind creating some, you know, carve-out to 401(k) plans

20   that hadn't yet been created.

21            With respect to the Tatum case, the notion that

22   a fiduciary contemplating whether to remove a former

23   employer stock would fear having to go to trial under

24   Tatum I think has another timing issue, which is that

25   Tatum was filed 2002 well before Dudenhoeffer, which was

1    decided in 2014.

2            So the notion that the plaintiffs have put on

3    the table that there's some right call as to whether a

4    stock is a good stock to offer on the plan or a bad stock,

5    is belied by the opinion of the court in Dudenhoeffer

6    which says, no, the market is going to set a fair price.

7    There is no good deal or bad deal for an individual stock

8    that is traded on an efficient market.

9            And finally, plaintiff's counsel challenged us

10   to dispute the assertion that concentration risk is

11   incorporated into the stock price.  From our perspective,

12   that assertion is a non sequitur because every stock is

13   priced individually.  So the question in pricing any

14   stock, the question the market is undertaking is what is

15   the value of this individual stock.

16           Now, when stocks are bundled together, if those

17   stocks are not fully correlated, the effect of a basket of

18   assets is to have a lower expected standard deviation and

19   a lower expected risk.  That's a matter of statistics.

20           But in terms of an individual stock, you know,

21   the notion of whether the price of an individual stock

22   incorporates concentration risk is, you know, from our

23   standpoint an assertion or a dispute that just doesn't

24   make any sense.  Because the question at the end of the

25   day is:  Is the stock priced fairly, and under

1    Dudenhoeffer it is.  And then the secondary question for a
2    fiduciary is do the participants have the ability to use
3    the stock to create a diversified portfolio.  And on the
4    record and the complaint here, they do.
5              THE COURT:  What about the argument that the
6    plan as a whole was inadequately diversified because of
7    the presence of 15 percent of Verizon stock?
8              MR. NETTER:  Well --
9              THE COURT:  You remember counsel talked about
10   how even in a telecommunications fund you wouldn't see
11   that sort of allocation.
12             MR. NETTER:  So, Your Honor, this same issue
13   again has risen in the other cases that are related to
14   this case.  And the way that the other districts courts
15   have addressed the issue and processed this is I think
16   instructive.
17             They say the only way to look at this
18   diversification obligation in the context of a 401(k) plan
19   as opposed to the context of a defined benefit plan is to
20   look at what the fiduciaries can do in their role, and
21   given that the role of the fiduciaries is to create
22   options that permit the participant to diversify their
23   accounts, a fiduciary discharges his obligations by
24   presenting those diversified options.
25             There isn't any precedent that the plaintiffs

1    have cited or that we're aware of that says that there

2    reaches a point if participants who have no interest in

3    each other's accounts somehow in the collective

4    concentrate their assets in one particular stock or in one

5    particular asset class, that it impels the fiduciary to

6    act to create, you know, different rules for these

7    individual participants.

8              It's not a standard that has been created by the

9    courts, it's not a standard that makes any logical sense

10   given the role of the fiduciary and the expectations of

11   those fiduciaries that is established and written

12   throughout the code.

13             THE COURT:  Okay, thank you.

14             MR. NETTER:  Thank you, Your Honor.

15             THE COURT:  Thank you all for coming in today.

16             (Proceedings adjourned at 3:12 p.m.)

17

18

19

20

21

22

23

24

25

1                     C E R T I F I C A T E

2

3          In Re: REIDT vs. FRONTIER COMMUNICATIONS

4

5

6          I, Darlene A. Warner, RDR-CRR, Official Court

7    Reporter for the United States District Court for the

8    District of Connecticut, do hereby certify that the

9    foregoing pages are a true and accurate transcription of

10   my shorthand notes taken in the aforementioned matter to

11   the best of my skill and ability.

12

13

14

15

16              /s/_____

17              DARLENE A. WARNER, RDR-CRR
                  Official Court Reporter
                450 Main Street, Room #223
18              Hartford, Connecticut 06103
                darlene_warner@ctd.uscourts.gov
19

20

21

22

23

24

25